19-MJ-2351-MBA
19-MJ-2352-MBA

## AFFIDAVIT OF CHARLES E. SIMON

I, Charles E. Simon, being duly sworn, depose and state as follows:

1.    I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") since 2011. For the majority of that time, I have been engaged in gang and drug investigations.  I am currently assigned to the Boston Field Office, North Shore Gang Task Force.  I am a "federal law enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws of the United States and within a category of officers authorized by the Attorney General to request a search warrant.[1]

2.    Prior to my employment with the FBI, I was employed by the Wichita Police Department in Wichita, Kansas from May 1999 through February 2011.  As a Police Officer in Wichita, I held the positions of Patrol Officer, Drug Officer, Gang Intelligence Officer, Night Detective, and Felony Assault/Gang Detective.  In the course of all these positions, I have participated in numerous

---

[1] From July 2011 until November 2015, I was assigned to the New Orleans Field Office, Shreveport Resident Agency and to the Northwest Louisiana Violent Crimes Task Force.  I then transferred to the Boston Division and was assigned to the Organized Crime Squad in June, 2016.

investigations of narcotics, firearm and violent felony crimes.  I have conducted investigations utilizing complex investigative techniques and the utilization of analytical methods during homicides, shootings, aggravated assaults, aggravated batteries, narcotic, firearm, fraud, and theft investigations.

3.    I have received training and experience in interviewing and interrogation, arrest procedures, search and seizure, criminal organizations, narcotics, money laundering, search warrant applications, and various other investigative techniques and methods.  During the course of my employment with the FBI and the Wichita Police Department, I have served as a Case Agent and/or assisted other agents/law enforcement officers in investigations which involved the use of undercover officers, confidential sources, cooperating witnesses, physical surveillance, pen registers, trap and trace devices, toll analysis, CCTV surveillance, consensual recordings and monitoring, drug and firearm evidence purchases, service of arrest warrants, subject interviews, conducting short-term and long-term narcotics and gang investigations, conducting court-authorized electronic surveillance, conducting court-authorized Title III wiretap investigations, preparing and executing search warrants that have led to substantial seizures of narcotics, firearms, and other contraband.

4.   I have participated in the investigation described in detail below.  During my work on this investigation, I have interviewed witnesses about their knowledge of the matters described below, and reviewed recordings of meetings.  I have reviewed reports prepared by other agents and Task Force Officers and also conducted surveillance and discussed this case with other law enforcement officers who have assisted in this investigation.  As a result of my personal participation in this investigation, through my conversations with other law enforcement officers, and my analysis of reports prepared by other officers, I am familiar with this investigation.  Because this affidavit is submitted for the limited purpose of supporting issuance of an Order and accompanying search warrants for the Target Telephone listed below, I have not presented every fact learned during the investigation, but only that information necessary to establish probable cause for the requested warrants.

## INTRODUCTION

5.   I am submitting this affidavit in support of an application for the issuance of search warrants pursuant to Federal Rule of Criminal Procedure 41 and Title 18, United States Code, Section 2703(c)(1)(A), for information about the location of a cellular phone assigned number 978-902-7484 ("the

Target Telephone") for a period of thirty (30) days.  This search warrant application also seeks the disclosure of historical cell site information for the Target Telephone for the period July 23, 2019 to August 20, 2019 in order to obtain evidence that may be relevant to an investigation into trafficking activity by **NORMA CLAUDIO** (**"CLAUDIO"**) and her co-conspirators.  The Target Telephone is described in Attachment A-1 along with the information to be seized described in Attachment B-1.

6. This affidavit is also being submitted in support of a search warrant application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique to determine the location of the cellular device assigned number 978-902-7484, (the same "Target Telephone"), as described in Attachments A-2 and B-2 to that application (the proposed "CSS Warrant"). The investigative technique described in Attachments A-2 and B-2 involves the use of a Cell Site Simulator ("CSS").  The purpose of applying for a search warrant authorizing the use of a CSS is to determine the precise location of the Target Telephone.

7. Because collecting the information authorized by the cell-site simulator warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device,"

see 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41. See 18 U.S.C. §§ 3121-3127. This warrant therefore includes all the information required to be included in a pen register order. See 18 U.S.C. § 3123(b)(1). Consistent with the requirement for an application for a pen register order, I certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the FBI. See 18 U.S.C. §§ 3122(b) and 3123(b).

## THE T-MOBILE TELEPHONE ASSIGNED PHONE NUMBER (978) 902-7484 AND USED BY NORMA CLAUDIO ("THE TARGET TELEPHONE")

8. The Target Telephone does not have a named subscriber and is believed to be used by **NORMA CLAUDIO**. The service provider for this phone is T-Mobile, a wireless telephone service provider which accepts process at 4 Sylvan Way, Parsippany, New Jersey 07054. The Target Telephone is further described in Attachment A-1 and the location information to be seized is further described in Attachment B-1. There is reason to believe the Target Telephone is currently located somewhere within this district because the owner is known to spend most of her time in this district; the area code corresponds to this district; and physical surveillance has observed **CLAUDIO** in this district as recently as August 11, 2019. Pursuant to Rule 41(b)(2), law enforcement may locate the Target Telephone

outside the district provided the Target Telephone is within the district when the warrant is issued.

9. Based on the facts set forth in this affidavit, there is probable cause to believe that **CLAUDIO** and her co-conspirators ("the Target Subjects") have violated 21 U.S.C. §§ 841(a)(1) and 846, conspiracy to distribute and the distribution of controlled substances (the "Target Offenses"). Additionally, probable cause exists to believe that the location information described in Attachment B-1 obtained from the named service provider or through the use of the technique described in Attachment B-2 will constitute or lead to: (1) evidence of offenses including the commission of controlled substances offenses under 21 U.S.C. §§841(a)(1) and 846; (2) property designed or intended for use or which is or has been used as a means of committing these offenses including the residences and stash locations used by **CLAUDIO** and her co-conspirators; (3) contraband, fruits of crime, or other items illegally possessed; and (4) the location of persons to be arrested.

## THE TARGET TELEPHONE IS BEING USED BY CLAUDIO

10. Telephone number 978-902-7484 ("the Target Telephone"), is a T-Mobile cellular telephone that does not have a named subscriber. The Target Telephone became active on July 23, 2019 and remains active. I believe, based an analysis of the telephone

data for the Target Telephone, and my involvement in this inves-
tigation, that **CLAUDIO** is now using the Target Telephone as a
"work" phone for drug-related conversations. I believe that **CLAU-
DIO** is likely to maintain the Target Telephone and will likely
possess the Target Telephone throughout the day. Being able to
identify the precise location of the Target Telephone will thus
aid investigators in identifying **CLAUDIO's** co-conspirators, stash
houses, drug suppliers, money laundering activity, and location
when it comes time to make arrests.

11. As noted, the Target Telephone was activated only recently
on July 23, 2019 and hence was not in operation when **CLAUDIO** and
**FERNANDEZ** made the drug sales to CW-1 that are described below.
For this reason, a pen register was initiated on the Target Tele-
phone on August 8, 2019 to determine whether the Target Telephone
was calling the same numbers as **CLAUDIO's** prior telephone numbers.
Although the Pen Register had only been operational for the four
day-period between August 8 and 11, 2019 at the time this analysis
was done, the Target Telephone has already called many numbers
also called by **CLAUDIO's** prior telephones. For example:

   a. The Target Telephone and **CLAUDIO's** old telephone number,
      978-885-8996, had the telephone number 978-885-4762 in com-
      mon. Target Telephone contacted 978-885-4762 one (1) time
      on August 10, 2019 while **CLAUDIO's** old telephone number,
      978-885-8996, contacted 978-885-4762 two hundred forty-six
      (246) times between July 1, 2017 and October 14, 2017.

   b. The Target Telephone and **CLAUDIO's** old telephone number,

978-376-2865, had the telephone numbers 978-885-4762 and 978-204-7205 in common. The Target Telephone contacted 978-885-4762 one (1) time on August 10, 2019 while **CLAU-DIO's** old telephone number, 978-376-2865, contacted 978-885-4762 forty-five (45) times between October 15, 2017 and November 25, 2017. The Target Telephone contacted 978-204-7205 a total of twenty-one (21) times on August 8, 2019 and August 9, 2019 while **CLAUDIO's** old telephone number, 978-376-2865, had eighty-two (82) contacts between October 16, 2017 and November 8, 2017 with 978-204-7205.

c. The Target Telephone and **CLAUDIO's** old number, 978-387-7928, had two (2) telephone numbers in common which are 978-885-4762 and 978-204-7205. The Target Telephone contacted 978-885-4762 one (1) time on August 10, 2019 while **CLAUDIO's** old telephone, 978-387-7928, had forty-four (44) contacts between December 24, 2017 and March 4, 2018. The Target Telephone contacted 978-204-7205 a total amount of twenty-one (21) times on August 8, 2019 and August 9, 2019 while **CLAUDIO's** old telephone, 978-387-7928 had 739 contacts between December 25, 2017 and March 4, 2018.

d. The Target Telephone and **CLAUDIO's** old telephone number, 978-242-2117, had one (1) number in common which is 978-204-7205. The Target Telephone contacted 978-204-7205 a total amount of twenty-one (21) times on August 8, 2019 and August 9, 2019 while **CLAUDIO's** old phone 978-242-2117 had one hundred twenty-two (122) contacts between March 14, 2018 and April 3, 2018.

e. The Target Telephone and **CLAUDIO's** old telephone number, 978-609-6008, had two (2) telephone numbers in common which are 978-204-7205 and 978-719-0638. The Target Telephone contacted 978-204-7205 a total amount of twenty-one (21) times on August 8, 2019 and August 9, 2019 while **CLAUDIO's** old telephone number, 978-609-6008 had twenty-five (25) contacts between September 10, 2018 and September 17, 2018. The Target Telephone contacted 978-719-0638 a total amount of eleven (11) times on August 8, 2019 and August 9, 2019 while **CLAUDIO's** old telephone number, 978-609-6008, had nineteen (19) contacts between September 11, 2018 and September 17, 2018.

**PROBABLE CAUSE FOR ISSUANCE OF THE REQUESTED SEARCH WARRANTS**

12.   Beginning in approximately June, 2017, the North Shore
Gang Task Force ("NSGTF") consisting of the FBI, Homeland
Security Investigations ("HSI"), and the Massachusetts State
Police ("MSP") initiated operations focusing on narcotics
distribution in the Lawrence, MA area.   In this investigation, a
cooperating witness ("CW-1")[2] was used to make controlled
purchases of cocaine base and other drugs from dealers operating
in the city of Lawrence.   CW-1 conducted three (3) controlled
purchases of crack cocaine with **CLAUDIO,** one (1) controlled
purchase of crack cocaine with **JUAN RAMON FERNANDEZ,** and two (2)
controlled purchases of crack cocaine/cocaine with both **CLAUDIO**
and **FERNANDEZ.**[3] The investigation revealed that **CLAUDIO** and
**FERNANDEZ** lived together and are boyfriend/girlfriend who worked
cooperatively in distributing ounce and multi-ounce quantities
of crack cocaine and other drugs.   It is believed that they

---

2  CW-1 began working with the FBI after being arrested on drug
charges in the hopes that his cooperation would assist in the
disposition of the case (which it to date has). CW-1 was also
paid approximately $15,000 for services by the FBI exclusive of
relocation costs. Apart from the arrest that prompted CW-1's
cooperation in the first place, CW-1 has no criminal record but
is a user of marijuana. Agents working with CW-1 (including
myself) believe that the information CW-1 provided has been
accurate and reliable.

3 CW-1 also conducted five (5) controlled purchases of crack
  cocaine with two other individuals who were directly supplied
  by **CLAUDIO.**

continue to sell controlled substances together in the Lawrence, Massachusetts area and that **CLAUDIO** is using the Target Telephone in furtherance of their longstanding operations.

**A.     AUGUST 30, 2017 PURCHASE OF 78.3 GRAMS OF COCAINE BASE FROM CLAUDIO**

13.    The first buy that CW-1 made directly from **CLAUDIO** took place on August 30, 2017. The August 30, 2017 buy was initiated when another individual put CW-1 in contact with **CLAUDIO** so that CW-1 could purchase three (3) ounces of crack cocaine.  Specifically, CW-1 was told to go to 343 Lowell Street in Lawrence to meet **CLAUDIO** and purchase three (3) ounces of crack cocaine for $4500. In anticipation of the buy, agents met with CW-1 to prepare CW-1 for the purchase.  CW-1 was searched for cash and contraband (with negative results) and provided with $4500 in buy money, audio and video recording equipment, and sent into the area of 343 Lowell Street where he/she arrived at approximately 4:40 PM.

14.    Once at 343 Lowell Street, CW-1 found **CLAUDIO** and a male waiting for him/her. **CLAUDIO** directed CW-1 to get into the passenger seat of her white Honda and she then joined CW-1 by getting into the driver's seat. Once inside, CW-1 gave **CLAUDIO** the cash, telling her, "Here, count it." After **CLAUDIO** had counted the money and determined that it was correct, she handed

CW-1 three (3) bags of an off-white substance that had been sitting in the compartment on the driver's side door.

15. Once the deal was complete, CW-1 got out of **CLAUDIO**'s Honda, talked briefly to the male who had greeted him/her on arrival, and then returned to a predetermined meeting location where CW-1 met with myself and another agent and handed over the drugs, the recording equipment, was searched for a second time, and then debriefed.

16. Upon return to our offices, the drugs that CW-1 had purchased from **CLAUDIO** were identified as crack cocaine, weighed (87.92 grams with the original packaging) field tested (positive for cocaine) and sent to the DEA Regional Laboratory in New York. On December 31, 2018, the DEA Lab certified that the drugs were 78.3 grams of cocaine base.

**B.   SEPTEMBER 21, 2017 PURCHASE OF 79.32 GRAMS OF COCAINE BASE FROM CLAUDIO**

17. CW-1 next met with **CLAUDIO** to purchase three (3) more ounces of crack cocaine on September 21, 2017. This second buy was initiated earlier in the day of September 21 when CW-1 met with myself and contacted **CLAUDIO** by phone at 978-885-8996.[4] Upon ending the call (which like all communications by CW-1 with

---

4 During part of the underlying investigation, my co-case agent was an individual who spoke Spanish. That agent was transferred to another jurisdiction during the investigation.

**CLAUDIO** were conducted in Spanish), CW-1 confirmed that he/she had spoken with **CLAUDIO**, who agreed to sell CW-1 three (3) ounces of crack cocaine.  Based on prior sales, agents were aware that **CLAUDIO** charged $1500 per ounce for a total of $4500.

18.  In anticipation of the buy, agents from the task force took up surveillance in the area of 92 Haverhill Street in Lawrence where **CLAUDIO** was believed to be living.  Agents were also aware from earlier buys that **CLAUDIO** drove a white Honda Accord bearing MA license plate 3RZ 815 that was registered to her.

19.  Shortly after 4:00 PM, myself and another agent directed CW-1 to contact **CLAUDIO** to finalize arrangements for the buy.  In the resulting call, **CLAUDIO** agreed to meet CW-1 at the Tripoli Pizza and Bakery located at 106 Common Street in Lawrence.

20.  CW-1 was then prepared for the buy.  He/she was searched, given $4500 in buy money, audio and video recording equipment and sent into the area of the Tripoli Pizza and Bakery to meet **CLAUDIO**.

21.  Agents watched CW-1 arrive at the Tripoli Pizza and Bakery at approximately 4:20 PM to wait for **CLAUDIO**'s arrival. While this was happening, other agents surveilled **CLAUDIO**'s white Honda (with **CLAUDIO** driving) leaving from 92 Haverhill

Street, watching her make a stop at an unknown residence for a short period of time and then leaving, driving a short distance and letting an unknown individual exit the passenger seat with a bag. **CLAUDIO** then proceeded into the Tripoli parking lot at approximately 4:28 PM.

22. Once **CLAUDIO** pulled into the lot, CW-1 came out and got into the Honda's front seat. CW-1 exited the Honda Accord after the vehicle circled the block. CW-1 then returned to a predetermined meeting location where he/she was searched for a second time, and turned over the drugs purchased from **CLAUDIO** and the recordings. During CW-1's subsequent debrief, he/she stated that, when CW-1 got into **CLAUDIO**'s car, she asked if CW-1 wanted to do the deal in the parking lot and proceeded to exchange CW-1's buy money for three (3) bags of an off white substance that **CLAUDIO** was holding between her legs.[5]

23. The drugs CW-1 purchased from **CLAUDIO** were later inspected (and determined to be crack cocaine), weighed (87.90 grams with the original packaging), field tested (positive for cocaine base) and sent to the DEA Lab in New York. On October 17, 2018, the DEA Lab certified that the drugs were 79.32 grams of cocaine base.

---

5 After the buy was complete, surveillance agents saw **CLAUDIO** return to 92 Haverhill Street and enter that building.

### C.   OCTOBER 25, 2017 PURCHASE OF 53.3 GRAMS OF COCAINE BASE FROM FERNANDEZ INSIDE 92 HAVERHILL STREET

24.   The next buy made from **CLAUDIO** and/or **FERNANDEZ** took place on October 25, 2017.  This buy was initiated when CW-1 made contact with **FERNANDEZ** during the afternoon of October 24 at **FERNANDEZ** and **CLAUDIO**'s apartment (then located on the second floor of 92 Haverhill Street in Lawrence).  Initially, myself and the other agents conducted surveillance on the location in an attempt to observe **CLAUDIO** leave the residence so CW-1 could contact **FERNANDEZ**.  After **CLAUDIO** was observed leaving the residence, CW-1 was searched and provided with $3000 in buy money and recording equipment by myself and other agents, then sent to contact **FERNANDEZ** at approximately 4:35 PM.  **FERNANDEZ** brought CW-1 upstairs where **FERNANDEZ** told CW-1 that he didn't have two (2) ounces of crack cocaine to sell but advised CW-1 to return in 45 minutes.

25.   CW-1 then left and returned to a predetermined meeting location where he/she provided myself and other agents with the unused $3000 buy money, the recording equipment, was searched a second time and was debriefed.

26.   At approximately 6:10 PM, CW-1 was prepared to go meet with **FERNANDEZ** a second time to purchase two (2) ounces of crack cocaine.  CW-1 was searched again and provided the $3000 buy money and the recording equipment.  CW-1 was sent to 92

Haverhill Street where he/she arrived at approximately 6:20 PM, went to the second floor apartment and contacted an unidentified male.  The unidentified male advised **FERNANDEZ** and **CLAUDIO** had just left; therefore, CW-1 waited outside for them to return. **FERNANDEZ** and **CLAUDIO** arrived back to 92 Haverhill Street but advised CW-1 that they did not have any more crack cocaine to sell but would have it the following day.

27.   In anticipation of the buy, myself and other agents from by task force met with CW-1 at approximately 3:30 PM on October 25 to prepare CW-1 for the crack cocaine purchase.  CW-1 was searched for money and contraband (with negative results) and provided with $3000 in buy money, audio and video recording equipment, and sent into the area of 92 Haverhill Street to contact **FERNANDEZ** to purchase the two (2) ounces of crack cocaine where he/she arrived at approximately 3:40 PM.

28.   As CW-1 approached 92 Haverhill Street, he/she saw **FERNANDEZ** approaching his residence with a bicycle.  **FERNANDEZ** invited CW-1 to come to the second floor apartment.  Once inside, CW-1 gave **FERNANDEZ** the buy money.  **FERNANDEZ** counted it and returned $200 to CW-1 because **FERNANDEZ** was charging CW-1 $2800 for the two ounces of crack cocaine.  **FERNANDEZ** then went to a nearby kitchen cabinet from which he removed crack cocaine and then prepared two (2) ounces that he weighed, packaged, and

provided to CW-1.  Once the deal was complete, CW-1 left
**FERNANDEZ**'s apartment and returned to a predetermined meeting
location where CW-1 met with myself and other agents from my
task force and handed over the drugs, the recording equipment,
was searched for a second time and then debriefed.

29.  Upon return to our offices, the drugs that CW-1 had
purchased from **FERNANDEZ** were identified as crack cocaine,
weighed (58.75 grams with the original packaging) field tested
(positive for cocaine base) and sent to the DEA Regional
Laboratory in New York.  On March 15, 2018, the DEA Lab
certified that the drugs were 53.3 grams of cocaine base.

### D.  ATTEMPTED IDENTIFICATION OF FERNANDEZ ON NOVEMBER 3, 2017

30.  On November 3, 2017, physical surveillance was
conducted on **CLAUDIO** and **FERNANDEZ** in an attempt to confirm
**FERNANDEZ**' identity.  At the time, the task force only knew
**FERNANDEZ** as "RAMON".  Agents saw **CLAUDIO** and **FERNANDEZ** leave 92
Haverhill Street and enter the white Honda Accord bearing MA
license plate 3RZ 815 which was registered to **CLAUDIO**.  **CLAUDIO**
entered the driver's seat of the vehicle as **FERNANDEZ** entered
the front passenger seat.  A vehicle stop was initiated by two
MSP state troopers.  The troopers contacted both **CLAUDIO** and
**FERNANDEZ** as well as obtained **CLAUDIO's** driver's license.  As
soon as **FERNANDEZ**'s name was requested by the trooper, **CLAUDIO**

drove off in the vehicle attempting to elude the troopers even though **CLAUDIO**'s driver's license was still in the possession of the troopers.

31. **CLAUDIO** was observed running back to 92 Haverhill Street, entering the front door and then exiting the front door with a plastic bag in her possession and going around the building to an unknown location.  The Honda Accord was located unoccupied away from 92 Haverhill Street.

32. On November 9, 2017, CW-1 spoke with **CLAUDIO** who advised CW-1 that she and **FERNANDEZ** ran from law enforcement when they were pulled over in her white Honda Accord.  **CLAUDIO** advised she waited for the law enforcement officers to exit their vehicle and then took off, went around the corner, and dropped **FERNANDEZ** off who fled on foot.  **CLAUDIO** advised CW-1 that they ran due to them having approximately seven (7) to eight (8) ounces of crack cocaine, a firearm, and approximately $26,000 in the vehicle as well as **FERNANDEZ** not having legal documentation to be in the United States.

33. **CLAUDIO** advised CW-1 that she planned to move to a different location due to the apartment being too "hot" with law enforcement and with other individuals, who attempted to rob her, knowing where **CLAUDIO** and **FERNANDEZ** lived.  Due to individuals attempting to rob her, **CLAUDIO** and **FERNANDEZ** kept

firearms in their residence.  **CLAUDIO** also advised that she and **FERNANDEZ** would keep smaller amounts of crack cocaine in their apartment and keep the larger amounts in an unknown stash location.

34. On December 13, 2017, CW-1 went to 92 Haverhill Street Apt. 2 to contact **CLAUDIO**.  **CLAUDIO** allowed CW-1 to enter the apartment and CW-1 observed the apartment to be empty.  **CLAUDIO** advised CW-1 that she and **FERNANDEZ** were moving to a different residence.  The CW also reported that **FERNANDEZ** was hiding in the closet with a handgun.

### E.   JANUARY 31, 2018 PURCHASE OF 27.0103 GRAMS OF COCAINE BASE FROM CLAUDIO

35. CW-1 also met with **CLAUDIO** to purchase one (1) ounce of crack cocaine on January 31, 2018.  This buy was initiated earlier in the day of January 31 when CW-1 met with me and contacted **CLAUDIO** by phone at 978-387-7928.  Upon ending the call (conducted in Spanish), CW-1 confirmed that he/she had spoken with **CLAUDIO,** who agreed to sell CW-1 one (1) ounce of crack cocaine for $1400.

36. In anticipation of the buy, myself and another agent met with CW-1 at approximately 1:23 PM and contacted **CLAUDIO** by phone at 978-387-7928.  Upon ending the call, CW-1 confirmed that he/she had spoken with **CLAUDIO,** who agreed to meet CW-1 at the Tripoli Pizza and Bakery located at 106 Common Street in

Lawrence to sell CW-1 one (1) ounce of crack cocaine. The CW was

then searched for cash and contraband (with negative results)

and provided with $1400 in buy money, audio and video recording

equipment, and sent to the area of 106 Common Street where

he/she arrived at approximately 1:33 PM.

37.   Prior to the controlled purchase, surveillance had

been established in the area of 92 Haverhill Street.  Even

though **CLAUDIO** and **FERNANDEZ** had stated that they had moved,

surveillance located the white Honda Accord bearing license

plate 3RZ 815 parked in front of the address.  The vehicle then

departed; however, surveillance agents did not follow due to

**CLAUDIO** being known to utilize counter-surveillance techniques

to attempt to identify any surveillance operations. Also,

**CLAUDIO** had previously indicated to CW-1 that she had been

followed by law enforcement in the past which caused her to

change her telephone number.

38.   As CW-1 waited for **CLAUDIO, CLAUDIO** contacted him/her

by phone and advised she had to go to her house in South

Lawrence (92 Haverhill Street is not in South Lawrence) to

obtain the narcotics and then would be on her way to meet CW-1.

Once **CLAUDIO** pulled into the lot, CW-1 entered the Honda's front

seat.  CW-1 exited the Honda Accord after the vehicle circled

the block.  CW-1 then returned to a predetermined meeting

location where he/she was searched for a second time, and turned over the drugs purchased from **CLAUDIO** and the recordings.

39.   The drugs CW-1 purchased from **CLAUDIO** were later inspected (and determined to be crack cocaine), weighed (29.2 grams with the original packaging), field tested (positive for cocaine base) and sent to the DEA Lab in New York. On March 15, 2018, the DEA Lab certified that the drugs were 27.0103 grams of cocaine base.

### F.   FEBRUARY 14, 2018 PURCHASE OF 27.5513 GRAMS OF COCAINE BASE FROM CLAUDIO AND FERNANDEZ

40.   CW-1 next met with **CLAUDIO** and **FERNANDEZ** to purchase one (1) ounce of crack cocaine on February 14, 2018.   In anticipation of the buy, myself and another agent met with CW-1 at approximately 3:00 PM and contacted **CLAUDIO** by phone at 978-387-7928. Upon ending the call (conducted in Spanish), CW-1 confirmed that he/she had spoken with **CLAUDIO**, who agreed to meet CW-1 at the Tripoli Pizza and Bakery located at 106 Common Street to sell CW-1 one (1) ounce of crack cocaine for $1400. CW-1 was searched for cash and contraband (with negative results) and provided with $1400 in buy money, audio and video recording equipment, and sent to the area of 106 Common Street where he/she arrived at approximately 3:20 PM.

41.   Once **CLAUDIO** pulled into Tripoli's lot in the white Honda Accord, surveillance observed that the vehicle was also

occupied by a front passenger who was later identified as
**FERNANDEZ**.  CW-1 entered into the Honda's rear passenger seat.
CW-1 exited the Honda Accord after the vehicle drove a short
distance.  CW-1 then returned to a predetermined meeting
location where he/she was searched for a second time, and turned
over the drugs purchased from **CLAUDIO** and **FERNANDEZ** as well as
the recording equipment. During CW-1's subsequent debrief, CW-1
advised he/she handed **CLAUDIO** the money after entering the
vehicle in which **CLAUDIO** retrieved the crack cocaine from the
driver's door side door handle and passed it back to CW-1.
Before exiting the Honda, CW-1 observed approximately six (6) to
seven (7) individually packaged ounces of crack cocaine sitting
between **CLAUDIO**'s legs.

42.  The drugs CW-1 purchased from **CLAUDIO** and **FERNANDEZ**
were later inspected (and determined to be crack cocaine),
weighed (29.28 grams with the original packaging), field tested
(positive for cocaine base) and sent to the DEA Lab in New York.
On March 15, 2018, the DEA Lab certified that the drugs were
27.5513 grams of cocaine base.

43. Surveillance was conducted on **CLAUDIO** and **FERNANDEZ**
with assistance of the FBI Air Section at the conclusion of the
controlled purchase of the crack cocaine.  The Air Section was
utilized due to **CLAUDIO**'s counter-surveillance techniques.

During the surveillance operation, **CLAUDIO** was positively identified as the driver and **FERNANDEZ** as the front passenger. They exhibited actions consistent with that of conducting drug transactions by meeting with individuals at different locations for short amounts of time.   However, the drug transactions could not be confirmed.

### G.   OCTOBER 5, 2018 PURCHASE OF 27.8 GRAMS OF COCAINE FROM CLAUDIO AND FERNANDEZ

44. CW-1 met with **CLAUDIO** and **FERNANDEZ** to purchase one (1) ounce of cocaine on October 5, 2018.   In anticipation of the buy, myself and another member of the task force met with CW-1 at approximately 9:40 AM on October 5 and CW-1 was searched for cash and contraband (with negative results). CW-1 contacted **CLAUDIO** by phone at 978-609-6008.   Upon ending the call (conducted in Spanish), CW-1 confirmed that he/she had spoken with **CLAUDIO**, who agreed to sell CW-1 one (1) ounce of cocaine for $1350 in the area of the Market Basket Grocery Store located at 700 Essex Street, Lawrence, MA.

45.   CW-1 re-contacted **CLAUDIO** by phone at 978-609-6008. Upon ending the call, CW-1 confirmed that he/she had spoken with **CLAUDIO** who advised she misunderstood CW-1 on the first call and thought CW-1 wanted to purchase one (1) of powder cocaine instead of crack cocaine from **CLAUDIO** for the price of $1350.

**CLAUDIO** increased the price of one (1) ounce of crack cocaine to $1500.  CW-1 re-contacted **CLAUDIO** by phone at 978-609-6008. Upon ending the call, CW-1 confirmed that he/she had spoken with **CLAUDIO**.  At my direction, CW-1 informed **CLAUDIO** that he/she would purchase the one (1) ounce of powder cocaine for $1350 instead of the crack cocaine for $1500.  These instructions were based on the fact that CW-1, the other task force member and I were already in the area of the Market Basket and had only brought $1350 for the controlled purchase.

46.  CW-1 was provided with $1350 in buy money, audio and video recording equipment, and sent to the area of 700 Essex Street where he/she arrived at approximately 10:26 AM.

47.  Initially, **CLAUDIO** brought crack cocaine instead of the powder cocaine and therefore had to return to her residence (then believed to be in South Lawrence), to obtain the powder cocaine.  **CLAUDIO** thereafter arrived back at the Market Basket along with **FERNANDEZ** who was the front passenger in a 2007 silver Honda Accord bearing license plate 3RZ 815 which was register to **CLAUDIO** at 92 Haverhill Street Apt. 2. CW-1 entered the rear passenger seat and exited after approximately one (1) minute.  CW-1 then returned to a predetermined meeting location where he/she was searched for a second time, and turned over the drugs purchased from **CLAUDIO** and **FERNANDEZ** as well as the

recording equipment. During CW-1's subsequent debrief, CW-1

advised he/she entered the silver Honda Accord with **CLAUDIO** and

**FERNANDEZ**.  **FERNANDEZ** handed CW-1 the powder cocaine and he/she

exited the vehicle.  CW-1 had already given **CLAUDIO** the money

when they initially met, when she realized she had brought crack

cocaine instead of powder cocaine.

48.   The drugs CW-1 purchased from **CLAUDIO** and **FERNANDEZ**

were later inspected (and determined to be cocaine), weighed

(29.32 grams with the original packaging), field tested

(positive for cocaine) and sent to the DEA Lab in New York. On

April 18, 2019, the DEA Lab certified that the drugs were 27.8

grams of cocaine.

### H.   IDENTIFICATION OF NEW VEHICLE REGISTERED TO CLAUDIO AT THE TARGET PREMISES ON FEBRUARY 1, 2019

49.   On February 1, 2019, a member of the task force

observed a 2005 black Grand Jeep Cherokee bearing MA license

plate 3RZ 815 registered to **CLAUDIO** at 92 Haverhill Street Apt.

2.  The vehicle was parked at 92 Haverhill Street.  The license

plate was reassigned to this vehicle on January 28, 2019.

### I.   JULY 29, 2019 SURVEILLANCE OF CLAUDIO AND FERNANDEZ

50. The investigation thereafter determined that **CLAUDIO**

and **FERNANDEZ** had moved back to 92 Haverhill Street and were now

utilizing a white 2007 Infiniti G35 sedan bearing the same MA

license plate (3RZ 815) registered to **CLAUDIO** at 92 Haverhill

Street Apt. 1.  This vehicle had been assigned the license plate on July 9, 2019 and the address is where we believe that **CLAUDIO** and **FERNANDEZ** are now living.

51.  On July 29 at approximately 6:00 pm, the FBI Air Section, other members of the task force and I conducted surveillance on both **CLAUDIO** and **FERNANDEZ**.  The surveillance operation observed both **CLAUDIO** and **FERNANDEZ** leave 92 Haverhill Street and enter the Infiniti after **FERNANDEZ** exited the front door of the building.  **CLAUDIO** entered the driver's seat of the vehicle as **FERNANDEZ** entered the front passenger seat.  They drove to Maple Street at Lawrence Street where they stopped in the middle of the street and allowed an unknown individual to enter the back passenger seat. The Infiniti drove a short distance and then the unknown individual exited the vehicle after approximately twenty (20) seconds.  **CLAUDIO** and **FERNANDEZ** then drove back to 92 Haverhill Street.  These actions were consistent with that of someone completing a drug transaction; however, the surveillance team could not locate the individual who entered the vehicle and thus could not confirm the drug transaction.

52.  Once at the residence, **CLAUDIO** remained outside and contacted an unknown individual as **FERNANDEZ** entered the front door of 92 Haverhill Street.  After approximately one (1)

minute, **FERNANDEZ** came back out the front door and they departed the residence.  Once again, **CLAUDIO** entered the driver's seat of the Infiniti as **FERNANDEZ** entered the front passenger seat.

53. **CLAUDIO** and **FERNANDEZ** drove directly to Springfield Street at Parker Street and pulled to the right and parked.  A Hispanic male wearing blue clothing who was later identified and will be referred to as "E.C."[6] then approached and entered the back passenger seat. After approximately seventeen (17) seconds, E.C. exited the vehicle and the Infiniti drove away from the area.  Believing that these actions were consistent with someone who just completed a drug transaction, myself and other members of the task force approached E.C. who was walking down the sidewalk.  We exited our vehicles and identified ourselves as law enforcement officers.  Upon seeing us, E.C. began to run but was quickly apprehended.  As E.C. was actively trying to flee, he threw several objects one of which appeared to be a white

---

6  E.C. agreed to speak with the arresting officers but has not been signed up as a source or provided any information other than in his post-Miranda statement.  E.C's criminal history involves arrests for drug violations and resisting arrest in New Hampshire where he was convicted on 3/29/2018 for Control Drug: Control Premises where Drugs.  In Massachusetts, he has been arrested for drug violations, breaking and entering, trespassing, kidnapping, armed robbery, assault and battery with danger weapon, and fail to stop for police.  The adult charges in Massachusetts have been dismissed except for the arrest on July 29, 2019 for the drug/firearm violations.

object.  In the area the objects were thrown, a plastic bag containing approximately twenty eight (28) grams of an off-white rock like substance consistent with that of crack cocaine was located along with a small silver loaded .22 caliber revolver. E.C. also had approximately sixteen (16) grams of an off-white rock like substance consistent with that of crack cocaine and $2403.00 in his pocket.

54.  While in the booking area of the Lawrence Police Department, E.C. was given his Miranda rights and agreed to answer questions after signing the Miranda Warning form and advising he understood his rights to a Task Force officer who speaks Spanish fluently.  E.C. stated he had approximately one (1) ounce of crack cocaine in one (1) bag and another five (5) grams of crack cocaine in the other bag.  He stated that he receives approximately one (1) ounce of crack cocaine every two (2) days at the price of $1300 per ounce from his crack cocaine supplier he identified as **"NORMA"**.

55. **"NORMA"** called E.C. to obtain $1900 that he owed her for previous narcotics he had received from her.  E.C. told **"NORMA"** to come get the money and to bring him "something" as well.  He identified **"NORMA's"** telephone number as the Target Telephone and had that number saved in his contacts as "Nolma2". When the white four-door sedan arrived, he entered the rear of

the vehicle and gave the $1900 to "**NORMA**" that he owed and received an additional ounce of crack cocaine from the older male in the front passenger seat.  E.C. would have to pay for that ounce of crack cocaine in two (2) days when he gets resupplied by "**NORMA**".  E.C. also identified **CLAUDIO**'s previous vehicle as a black Jeep prior to the white four-door sedan.

56. On July 30, 2019 National Grid Electric Company confirmed that an individual identified as "**NORMA** Clauvio" with the same last four (4) of **CLAUDIO**'s social security number as having active utilities at "92 HAVERHILL ST 1FRT LAWRENCE MA 01840".  This is believed to be the current residence of **CLAUDIO** and **FERNANDEZ**.

57. For the reasons listed above, I believe the Target Telephone is currently being used by **CLAUDIO** in furtherance of her ongoing drug operations.  I also submit that probable cause exists to believe the requested information associated with the Target Telephone will enable investigating agents to determine where **CLAUDIO** and her co-conspirators conduct their drug distribution business, with whom they meet, where they meet, where they store additional quantities of controlled substance and/or drug proceeds, and may assist in determining the identity of additional co-conspirators and the location of the Targets at arrest.  I believe that **CLAUDIO** has used and will continue to

use the Target Telephone to communicate with co-conspirators

customers, and others in furtherance of the Target Offenses.7

## THE RELEVANT TECHNOLOGY

58.   I know that cellular phone providers have technical

capabilities that allow them to collect and generate at least

two kinds of information about the locations of the mobile

phones to which they provide service: (1) E-911 Phase II data,

also known as GPS data or latitude-longitude data, and (2) cell-

site data, also known as "tower/face information" or cell

tower/sector records.   E-911 Phase II data provides relatively

precise location information about the mobile phone itself,

either via GPS tracking technology built into the phone or by

triangulating on the device's signal using data from several of

the provider's cell towers.   Cell-site data identifies the "cell

towers" (i.e., antenna towers covering specific geographic

---

7 **CLAUDIO's** Massachusetts Board of Probation Records reveals that
**CLAUDIO** was convicted in Lawrence District Court of
Distribute/Dispense Class B Cocaine and Distribute of Cocaine in
a School zone on June 5, 2006 where she received two years of
imprisonment.   **FERNANDEZ'** Massachusetts Board of Probation
Records reveals that he was convicted of the following drug
crimes on December 13, 2004 in Essex County Superior Court:
Trafficking Controlled Substance (8 years - 8 years and 1 day of
imprisonment), Distribute/Dispense Class B (5 years - 5 years 1
day of imprisonment), Two (2) counts Controlled Substance School
(2.5 - 2.5 years 1 day of imprisonment), and Trafficking
Controlled Substance Cocaine (3 years - 3 years 1 day of
imprisonment).   **FERNANDEZ** was also convicted of Possession to
Distribute Class B (1 year of imprisonment) and Possession to
Distribute Class A (1 year of imprisonment) on January 22, 2004.

areas) that received a radio signal from the mobile telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

59. Based on my training and experience, I have also learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

60. Based on my training and experience, I know that wireless providers such as T-Mobile can collect either cell-site data about the Target Telephone. I also know that wireless providers such as T-Mobile typically retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. This information can

include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  Based on my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the users of the Target Telephone and may assist in the identification of co-conspirators and/or customers.

61. Among other things, historical cell site information may assist law enforcement in confirming that **CLAUDIO** has been the user of the Target Telephone, was involved in drug trafficking activities on other dates, and may also help to identify her associates and the location of possible stash houses, and assist at arrest, among other things.

62.  The date range for the requested historical cell site information is from July 23, 2019 to August 20, 2019.  July 23, 2019 is used as the starting point because that was the date that the Target Telephone was activated.  Data through August

20, 2019 is requested because an arrest operation is being
considered for **CLAUDIO**.

## RELEVANT CSS TECHNOLOGY

63.   To facilitate the execution of the CSS warrant, law
enforcement may use an investigative device or devices capable
of broadcasting signals that will be received by the Target
Telephone or receiving signals from nearby cellular devices,
including the Target Telephone.   Such a device may function in
some respects like a cellular tower, except that it will not be
connected to the cellular network and cannot be used by a cell
phone to communicate with others.   The device may send a signal
to the Target Telephone and thereby prompt it to send signals
that include the unique identifier of the respective phone.   Law
enforcement may monitor the signals broadcast by the Target
Telephone and use that information to determine the Target
Telephone's location, even if it is located inside a house,
apartment, or other building.

64.   The investigative device may interrupt cellular
service of phones or other cellular devices within its immediate
vicinity.   Any service disruption to non-target devices will be
brief and temporary, and all operations will attempt to limit
the interference with such devices.   In order to connect with
the Target Telephone, the device may briefly exchange signals

with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be one of the Target Telephone, and law enforcement will limit the collection of information from devices other than the Target Telephone. To the extent that any information from a cellular device other than the Target Telephone is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Telephone from all other cellular devices.

65. WHEREFORE, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), it is requested that the Court issue the requested warrants and an Order authorizing agents of the FBI and anyone working on their behalf to employ an electronic investigative technique, which is described in Attachment B-2, to determine the location of the Target Telephone described in Attachment A-1 for a period of thirty (30) days. I further request that the Court authorize execution of the warrant at any time day or night, owing to the potential need to locate the Target Phone outside of daytime hours.

66. The execution of the warrant will not result in the seizure of any tangible property or any wire or electronic communication (as defined in 18 U.S.C. § 2510). To the extent that the warrants authorize the seizure of any stored wire or electronic information, that seizure is expressly authorized by 18 U.S.C. § 2703(c)(1)(A).

67. I further request that the Court order that all papers in support of this application, including the affidavit and search warrants, be sealed until further order of the Court, except that the government may produce them in criminal discovery and provide the search warrant to T-Mobile. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation. I further request pursuant to General Order 06-05 that the United States Attorney be provided copies of all sealed documents which the United States Attorney has filed in the above-styled matter.

68. Pursuant to 18 U.S.C. §§ 3121-26 and 2703 (d), I further request that the Court issue an Order authorizing the installation and use of a pen register and a trap and trace device with cell site location authority on the Target Telephone

for a period of sixty days. Again, I certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the FBI.

69.  I also request that the Court direct T-Mobile to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B-1 unobtrusively and with a minimum of interference with T-Mobile s services, including by initiating a signal to determine the location of the Target Telephone on T-Mobile's network, and at such intervals and times as directed by the government.  The FBI will compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

70.  I further request that, pursuant to the preclusion of notice provisions of 18 U.S.C. §§ 2703(b)(1)(A) & 2705(b), the Court order T-Mobile not to notify any person (including the subscribers or customers to whom the materials relate) of the existence of this application, the warrants, or the execution of the warrants, for the earlier of one year from the date of the Court's Order or upon notice by the government within 30 days of the conclusion of its investigation, unless the Court extends such period under 18 U.S.C. § 2705(b), except that T-Mobile may disclose this Order to its attorney for the purpose of receiving

legal advice.  Non-disclosure is appropriate in this case
because the requested warrants relate to an ongoing criminal
investigation that is neither public nor known to all of the
targets of the investigation.  There is accordingly reason to
believe that notification of the existence of the requested
warrants will seriously jeopardize the investigation by giving
targets an opportunity to flee from prosecution, destroy or
tamper with evidence, change patterns of behavior, intimidate
potential witnesses, or endanger the life or physical safety of
an individual.  See 18 U.S.C. § 2705(b).

71.  I further request that the Court order that all papers
in support of this application, including the affidavit and
search warrants, be sealed until further order of the Court,
except that the government may produce them in criminal
discovery and provide the search warrant to T-Mobile.  These
documents discuss an ongoing criminal investigation that is
neither public nor known to all of the targets of the
investigation.  Accordingly, there is good cause to seal these
documents because their premature disclosure may seriously
jeopardize that investigation.  I further request pursuant to
General Order 06-05 that the United States Attorney be provided
copies of all sealed documents which the United States Attorney

has filed in the above-styled matter.

_____
CHARLES E. SIMON
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION


Subscribed and sworn to
before me, this 16th day
of August, 2019.

HON. MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS

## ATTACHMENT A-1

Records and information associated with the 978-902-7484 phone number ("the Account"), and information about the location of the mobile phone assigned 978-902-7484 ("the Target Telephone"), whose service provider is T-Mobile, a company that accepts process at 4 Sylvan Way, Parsippany, New Jersey 07054, and stored at premises controlled by T-Mobile US, Inc. ("T-Mobile") or ("the Provider"), headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

## ATTACHMENT A-2

This warrant authorizes the use of the electronic investigative technique described in Attachment B-2 to identify the location of the cellular device assigned phone number 978-902-7484, whose listed subscriber is unknown, and whose wireless provider is T-Mobile, a company that accepts process at 4 Sylvan Way, Parsippany, New Jersey 07054 ("the Target Telephone).

## ATTACHMENT B-1

I.    Prospective information about the location of the Target Telephone described in Attachment A-1 for a period of 30 days, during all times of day and night, including:

    a.  E-911 Phase II data;

    b.  GPS data;

    c.  latitude-longitude data;

    d.  other precise location information; and

    e.  pen register / trap and trace device with prospective cell site information and all related data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the Target Telephone during any voice, SMS, and/or data transmission.

II.   Historical records related to the Target Telephone described in Attachment A-1

The Provider is also required to disclose to the government the following documents/information pertaining to the Account associated with the Target Telephone listed in Attachment A-1 for the period of July 23, 2019 to August 20, 2019:

    a.  The following information about the subscribers of the Account:

        i.    Names (including subscriber names, user names, and screen names);

        ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.  Local and long distance telephone connection records;

        iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.    Length of service (including start date) and types of service utilized;

vi.     Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.    Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records.

b.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

i.      Records of user activity for each connection made to or from the Accounts, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;

ii.     Information about each communication sent or received by the Accounts, including the date and time of the communication, the method of communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers);

iii.    All data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from each cellular telephone or device assigned to the Accounts, to include all voice, SMS, MMS, and data activity; and

iv.     All records containing round-trip-distance measurements for each connection made to or from the Accounts, to include NELOS, RTT, True Call Measurement Data, PCMD records, and all other records containing timing advance measurements and distance-to-tower

measurements for all technologies (CDMA, GSM, UMTS, LTE, etc.) and Reveal Reports.

v.   Internet activity reports, records of Internet Protocol (IP) usage, etc.

This warrant does not authorize the collection of any content of any communications.

T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Information about the location of the Target Telephone unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of the Target Telephone on T-Mobile's network, and at such intervals and times directed by the government.   The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such assistance.

T-Mobile shall not disclose the existence of the search warrant to the listed subscriber or to any other person for a period of one year from the date of this Order, or upon notice by the government within 30 days of the conclusion of its investigation, whichever is earlier, unless the Court extends such period under 18 U.S.C. § 2705(b). *See* 18 U.S.C. § 2705(b). T-Mobile may disclose this Order to an attorney for T-Mobile for the purpose of receiving legal advice.

## Information to be Seized by the Government

All information that constitutes evidence, fruits, contraband, and instrumentalities of violations of 21 U.S.C. §841 (distribution/possession with intent to distribute controlled substances) and §846) (conspiracy to commit the same).

## ATTACHMENT B-2

This warrant authorizes the officers to whom it is directed to determine the location of the Target Telephone identified in Attachment A-2 by collecting and examining:

1. Radio signals emitted by the Target Telephone for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and,

2. Radio signals emitted by the Target Telephone in response to radio signals sent to the cellular devices by the officers,

for a period of 30 days, during all times of day and night. This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).

Once the further identification and specific location of the Target Telephone has been made, information regarding any other telephones besides the Target Telephone will be deleted, and agents will cease using this electronic investigative technique.